**UNITED STATES of America, Appellee,**

**v.**

**Marilyn BUCK, Defendant-Appellant.**

**No. 33, Docket 86–1200.**

United States Court of Appeals, Second Circuit.

Argued Sept. 8, 1986.
Decided Nov. 3, 1986.

James L. Kainen, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Kenneth Roth, Asst. U.S. Attorney, New York City, on the brief), for appellee.

Judith L. Holmes, New York City (Jill Elijah, Holmes & Tipograph, New York City, on the brief), for defendant-appellant.

Before MANSFIELD, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Marilyn Buck appeals from a judgment entered in the United States District Court for the Southern District of New York after a jury trial before Robert L. Carter, *Judge*, convicting her, as a previously convicted felon, on one count of transporting a firearm and ammunition in interstate commerce in violation of 18 U.S.C. § 922(g) (1982). Buck was sentenced to five years' imprisonment, to be served consecutively to sentences previously imposed on her in connection with other crimes. On appeal, Buck contends that the evidence at trial was insufficient to establish that she had transported the weapon and ammunition, found in her possession at the time of her arrest, across a state line. We disagree and affirm the judgment of conviction.

## I. BACKGROUND

Buck was arrested along with one Linda Sue Evans on May 11, 1985, in Dobbs Ferry, New York. At the time of her arrest Buck was carrying a fully loaded and operable .38 caliber revolver in her handbag. At trial, the government sought to prove Buck's interstate transportation of the weapon through (1) the testimony of agents of the Federal Bureau of Investigation and the New York City Police Department Joint Terrorist Task Force recounting their surveillance of Buck during the twenty-four hours immediately preceding her arrest, and (2) a letter written by Buck following her arrest, describing her activities during the period preceding her arrest.

### A. *The Surveillance Testimony*

Surveillance agents first sighted Buck, known to be a fugitive, in Baltimore, Maryland, on May 10, 1985, and followed her and Evans as they traveled by car through Delaware and New Jersey to an apartment in the Bronx, New York. After remaining there for approximately one hour, Buck and Evans left at about 6:00 p.m. and drove to a shopping center in Golden's Bridge, New York. Their route took them through a section of Connecticut.

At the shopping center Buck briefly visited a drug store and then returned to the car. Buck and Evans then drove circuitously around residential blocks, stopping occasionally at the side of the road. At approximately 9:00 p.m., the agents lost track of Buck and Evans between the Katonah, New York train station and Pleasantville, New York. The agents relocated the car, with Buck and Evans in it, in a McDonald's parking lot some 20–30 minutes later and followed them to a Friendly's lot across the street. At about 10:30, Buck and Evans left the Friendly's lot and resumed their circuitous driving, stopping once at a gas station where they spoke to the attendant. Near midnight they stopped briefly in a Grand Union supermarket parking lot in Dobbs Ferry, then continued to a nearby Mobil gas station. There, both exited the car and Buck went into the building while Evans talked to the attendant. Buck and Evans then drove to a side street by the Grand Union, parked the car, and, after removing a bag from the trunk, Evans went into the supermarket. When Evans came out she signaled Buck, who joined her at the entrance. Evans then made a call from a telephone booth, went

into the supermarket again, returned and made another phone call. Buck was observed receiving two phone calls.

At about 1:00 a.m. on May 11, Buck and Evans drove into a parking lot near the Inn Town Motel in Ardsley, New York, and parked. They then escaped surveillance for approximately 1½ hours until the agents discovered that they had registered at the motel shortly after parking. The agents thereafter watched the car and the motel.

At approximately 9:30 a.m. the following morning, Buck and Evans left the motel. They were followed to Dobbs Ferry and there were arrested. At the time of her arrest, Buck was carrying a handbag that the agents had seen in her possession throughout their surveillance; inside it was the revolver, wrapped in a towel bearing the legend "Inn Town Motel."

### B. *Buck's Letter*

On the day after her arrest, Buck wrote an approximately 1000–word letter, later seized during a search incident to the arrest of one Alan Berkman, that recounted activities and perceptions of Buck and Evans from the time of their departure from the Bronx at 5:50 p.m. on May 10 until their arrest in Dobbs Ferry the next morning. The letter, bearing the heading "I *Detailed sequence of events* II Possible ways of how got to us III Traces" (emphasis in original), includes descriptions of events in particular time periods. For example, Buck described their arriving at "H" at 6:50; driving around the parking lot once to look for a car; observing particular vans and cars in the lot; driving over a bridge to the railroad station; passing other cars as they drove; returning to the parking lot to get film at a store; leaving the lot; returning again and parking at the far end of the lot; going to check out a brush area; noticing that certain cars were still where they had been seen before; noticing a man leave his car and enter a pharmacy where he used the telephone; observing youths walking down a path and over a fence; observing a previously observed car circle the lot and stop periodically, etc., all prior to 7:50.

The letter described events occurring at and after 8:19 p.m. as follows:

8:19   I got up from sitting on steps and left. Left to drive accross [*sic*] bridge and down to 22N to ascertain if could see people on stairs. Yes. Also that W# 1 [previously identified in the letter as a "white/maroon hardtop car"] was no longer next to V# 2 [previously identified in the letter as a blue van] As we pulled around curve to go to 22N W# 1 turned off 22 onto street going to 138. As passed he looked at us. ( [c.] 8.23) We left on 22N. A car [came?] behind us turned off to R before bar. As passed bar on L side of road a maroon car (the same? T not sure as was now dark) pulled out behind us. I thought that surely we were being followed (Now was complet. dark) Turned L at Purdy's went past entrances to Hiway & took 1st R into driveway/lane. Maroon car passed and made next R. T thought was man & woman in car. We turned out back onto hiway—S. Maroon did not pull out after us. As went S. 2 cars behind (coming from N not from same exit) pulled off road. We got off Katonah. One car got off [w/] us. Blue sporty Amer. car. We turned L he went R. Thought probably was not a tail at that time, as drove around area and did not pick up or see anyone else. Then proceeded S. on main str. (138) to S. Mill—S. Got off at Pleasantville. Drove around. Did not seem to be followed[.] After rejecting McD's as too busy we went into a Friendly lot to discuss sit.

In the Friendly's lot, Buck saw 2 men sitting in brown Toyota Honda. Had not seen them pull into lot after us so could not be sure if came before or after. We sat and discussed events to make collect decision. We agreed that while did not seem were being followed and that perhaps some of cars were coincidences we didn't know if the activity was around us or if was something diff. I posited that maybe had drawn a tip 2

weeks earlier but didn't get plate #. Agreed that 1 possibility, that we might have walked into something else....

Later the letter stated:

Found good safe parking in D. Ferry. Then tried to get a cab. I cleaned car again including finding in trunk an *oil receipt from Md* in bag of oil cans which I threw out [w/] other garbage in Grand Union lot. Now was 12:10 waited for a cab for 15 min.

(Emphasis in original.) After being informed at 12:30 a.m. that the cab was off duty, Buck and Evans "decided we should drive car nearer to motel and ditch. While T got room I went to a phone booth in motel lot passed a mgr? A p. car pulled thru lot [w/o?] stopping or slowing down."

The letter next detailed the events of the following morning. It began with Buck and Evans looking around their car, seeing nothing odd, and driving to Dobbs Ferry; continued with their observations of particular cars; and ended with their arrests. Involved in the arrests were a maroon car, a blue van, and a brown car driven by one of the men Buck had seen in the brown car in the Friendly's parking lot.

Buck's letter made no mention of their having acquired a weapon during the trip.

## II. DISCUSSION

Section 922(g) of 18 U.S.C. makes it unlawful "for any person ... who has been convicted in any court of[ ] a crime punishable by imprisonment for a term exceeding one year [or] who is a fugitive from justice ... to ship or transport any firearm or ammunition in interstate or foreign commerce." There is no question that at the time of her arrest, Buck was a convicted felon, as well as a fugitive from justice, and that she possessed a loaded revolver. She contends principally that the evidence was insufficient to support a finding beyond a reasonable doubt that she had transported the revolver across any state line. *See United States v. Gjurashaj*, 706 F.2d 395, 398 (2d Cir.1983) (government required to establish each element of the offense beyond a reasonable doubt). In

particular, she argues that (1) there was no direct evidence that she possessed the weapon in two different states, (2) the surveillance by the agents was noncontinuous and thus could not support an inference from her possession of the weapon on arrest that she had possessed it earlier when she crossed the New York-Connecticut borders, and (3) her letter could not fill in the gaps in the agents' surveillance because the letter did not purport to detail every event that had occurred during the period in question.

As our precedents emphasize, one who challenges on appeal the sufficiency of the evidence to convict bears a "very heavy burden." *United States v. Davis*, 767 F.2d 1025, 1040 (2d Cir.1985); *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985). The government was not required to exclude every possibility but that of guilt, *see Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954); *United States v. Soto*, 716 F.2d 989, 993 (2d Cir.1983), and the test on appeal is whether, viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), "the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt," *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456–57, 77 L.Ed.2d 1335 (1983). We conclude that Buck has not carried her burden.

Like any other fact, the interstate transportation of a weapon may be proved by direct evidence or by circumstantial evidence. Direct evidence, of course, would consist of proof, such as testimony by one having first-hand knowledge, that the defendant had the weapon in his possession as he crossed a state line. Most reported decisions discussing proof of the interstate transportation element of the § 922(g) offense have involved circumstantial evidence, *i.e.*, evidence of facts from which the defendant's possession of the weapon as he crossed a state line may be inferred.

In *United States v. Little*, 562 F.2d 578 (8th Cir.1977), for example, the evidence was that the defendant had seen a gun collection in Missouri, the gun collection was subsequently stolen, the defendant was later seen transferring a number of guns from a friend's car to his car, and he eventually sold two of the guns in Arkansas. The court noted that "[a]lthough the government's evidence was all circumstantial, circumstantial evidence can be the sole basis for a conviction on a substantive offense, and is intrinsically as probative as direct evidence." *Id.* at 580. It concluded that "the jury could infer interstate transportation from possession in one state of property recently stolen in another." *Id.* *See also United States v. Lehmann*, 613 F.2d 130, 133 (5th Cir.1980) (defendant's admission that he acquired gun in Louisiana, together with its discovery in his possession in Florida, held sufficient); *United States v. Phillips*, 432 F.2d 973, 976–77 (8th Cir.1970) (defendant's possession, as he deplaned in Missouri from a nonstop flight from Indiana, of a weapon that his traveling companion had seen in his possession before they left Indiana, held sufficient).

Contrary to Buck's suggestion, direct evidence of possession of an object in two different states is not a *sine qua non* for proof of its interstate transportation. We have little doubt that if the proof here had been that Buck had been under uninterrupted surveillance, had been observed traveling from one state to another, and had been found to possess a weapon upon her arrival in the second state, that alone would have sufficed to permit a rational juror to infer beyond a reasonable doubt that Buck had transported the weapon interstate.

The government's proof, however, showed not continuous surveillance but surveillance that was significantly interrupted twice, once for 20–30 minutes and again for 1½ hours, and it was physically possible for Buck to have obtained a weapon in either of these intervals. Nonetheless, while these gaps might have made the surveillance testimony insufficient in the absence of any other evidence to sustain the conviction, there was in fact other evidence from which the jury could rationally infer that Buck's acquisition of the weapon did not occur after she passed through Connecticut into Golden's Bridge, *i.e.,* Buck's thousand-word description of the period extending from their 6:00 p.m. departure from the Bronx until their capture the next morning.

As demonstrated above, the amount of detail set forth in the letter (the initial heading of which was "I *Detailed sequence of events,*" (emphasis in original)), was extensive. Yet, as Buck accurately points out, the letter is not all-inclusive as to the women's activities during the period in question. It does not, for example, describe Evans's forays into the Grand Union, or the stops at gas stations, or the conversations with the station attendants. In light of the overall detail of the letter, however, these gaps go not to the letter's relevance but to the weight to be accorded it, a matter that is wholly within the province of the jury. The jury could have found the letter a persuasive filler of the surveillance gaps in two ways. First, as to the first gap in surveillance, the narrative strongly indicates that Buck and Evans spent that entire time in maneuvers designed to determine whether there in fact was surveillance rather than in obtaining a weapon. Second, given Buck's evident concern for exploring how the law enforcement agents had sighted them (the second heading of the letter was "Possible ways of how got to us") and her speculation as to various possibilities (e.g., she "posited that maybe had drawn a tip 2 weeks earlier but didn't get plate # " or "that we might have walked into something else and could have drawn a tip"), the jury could easily infer that the letter would also have speculated on the possibility that the person who brought them the gun had been followed or that the place they got the gun might have been under surveillance, if in fact Buck had obtained the gun at any time after leaving the Bronx. In all, the detail of the letter was sufficiently extensive, and the con-

cerns expressed by Buck sufficiently pointed, to allow the jury to infer that if an event so significant as the acquisition of a gun had occurred, it would have been mentioned.

Thus, given the extensive surveillance, and given the style and contents of Buck's description of the period following her crossing of the New York-Connecticut borders, the evidence as a whole, taken in the light most favorable to the government, was sufficient to allow a rational juror to find beyond a reasonable doubt that Buck transported the weapon across state lines.

We have considered all of Buck's arguments on appeal and have found them to be without merit.

## CONCLUSION

The judgment of conviction is in all respects affirmed.