UNITED STATES of America, Appellee,

v.

Alan SCOP, Raphael Bloom, Herbert Stone and Jack Ringer, Defendants–Appellants.

Nos. 393, 391, 408 and 392, Dockets 87–1255, 87–1261, 87–1262 and 87–1270.

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1987.

Decided May 4, 1988.

Lawrence Iason, New York City (Sarah N. Chapman, Obermaier, Morvillo, Abramowitz & Iason, P.C., New York City, of counsel), for defendant-appellant Raphael Bloom.

Ira Lee Sorkin, New York City (Lawrence P. Eagel, Deborah R. Wolfe, Squadron, Ellenoff, Plesent & Lehrer, New York City, of counsel), for defendant-appellant Jack Ringer.

Michael L. Levine, New York City, for defendant-appellant Alan Scop.

Richard B. Lind, New York City, for defendant-appellant Herbert Stone.

Louis M. Fischer, Dept. of Justice, Washington, D.C. (Rudolph W. Giuliani, U.S. Atty. S.D.N.Y., New York City, Mitchell A. Mars, John J. Scully, Sp. Attys., Dept. of Justice, Chicago, Ill., of counsel), for appellee.

Before PIERCE, WINTER and MINER, Circuit Judges.

WINTER, Circuit Judge:

In 1980 and 1981, appellants Alan Scop, Raphael Bloom, Herbert Stone and Jack Ringer were variously involved in the initial offering and subsequent trading of the stock of an automobile dealership. Each was indicted for mail fraud in violation of 18 U.S.C. § 1341 (1982), securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and conspiracy to commit those offenses in violation of 18 U.S.C. § 371 (1982).[1] Appellants Bloom and Stone were also charged with making false declarations before a grand jury in violation of 18 U.S.C. § 1623 (1982). After a jury trial before Judge Pollack, appellants were convicted on all counts.

Several investors in the dealership's stock testified at trial, but the government's case was based primarily upon the testimony of a co-conspirator who testified pursuant to a plea agreement and upon that of a government investigator who testified as an expert witness. On appeal, appellants argue inter alia that their mail fraud, securities fraud and conspiracy convictions are time-barred and that the government's expert witness was wrongly allowed to give opinions that embodied legal conclusions and were based upon his assessment of the credibility of the testimony of other witnesses.

Because we believe that the expert witness's opinions were inadmissible, we reverse all but the false-declaration convictions.

## BACKGROUND

### A. *The Scheme*

We of course view the evidence in the light most favorable to the government. In 1979, Gary Brustein, a manager of a teenage discotheque, was approached by Ringer about financing the teenage discotheque through a public offering of stock. Brustein, however, was more interested in the automobile business than in the discotheque. He suggested to Ringer that they confer with Keith Sheldon, an old friend in the car business, about forming a new company, European Auto Classics ("EAC"), to

---

1. The mail fraud statute, 18 U.S.C. § 1341, prohibits the use of the mails for the purpose of executing "any scheme or artifice to defraud." Section 10(b), 15 U.S.C. § 78j(b), outlaws the use of "any manipulative or deceptive device or contrivance in contravention" of rules promulgated by the Securities and Exchange Commission in connection with the purchase and sale of securities. The relevant SEC rule is Rule 10b–5, 17 C.F.R. § 240.10b–5 (1987), which makes unlawful the use of "manipulative and deceptive devices" in connection with the purchase and sale of any securities. "Manipulative and deceptive devices" are defined to include employing "any device, scheme, or artifice to defraud," making "any untrue statement of a material fact or ... omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," or engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

sell foreign antique and classic cars to members of the affluent community of Great Neck, Long Island.

Money for the venture was to come from a public offering of stock in the new company. Because Brustein and Sheldon knew little about stock offerings or running a business, the decisions concerning the public offering and the start-up of the company were made by Ringer. Ringer brought in Martin Klein as vice-president to provide business experience while Ringer served as general manager, a job for which he was paid a weekly salary of about $275 and given the use of an automobile. Ringer selected the lawyer to handle the preparation and filing of the offering circular and other documents needed to take the company public. Because Ringer had "problems in the past with the SEC," however, these documents made no mention of his involvement. Finally, Ringer secured the services of Amfco Securities and Norbay Securities as co-underwriters for the public offering. Ringer was associated with Amfco, whose president and sole broker was Scop. Stone was a broker at Norbay.

Meanwhile, EAC leased a showroom and began renovating it, largely with borrowed money. In February 1980, Amfco and Norbay opened the public offering of fifty million shares of EAC stock at one cent per share. When the offering closed on April 3, 1980, all fifty million shares had been sold, and EAC had achieved its goal of a total initial financing of $500,000.

As participants in the EAC public offering, Ringer, Scop and Stone were prohibited from purchasing any of the company's stock during the public offering period by SEC Rule 10b–6, 17 C.F.R. § 240.10b–6 (1987). Nevertheless, Ringer and Scop attempted to circumvent this prohibition by the use of accounts in other names. For example, Ringer had his accounts in the name of his wife, brother-in-law and some friends, while Scop used the names of friends.

After the close of the public offering, EAC's stock was traded on the over-the-counter market through several brokerage firms acting as "market makers" willing to buy or sell EAC stock on a continuing basis. These included Amfco, Norbay and Jay W. Kaufmann & Co., a securities firm through which Bloom traded in the stock.

By May 1980, the price of the stock reached four cents per share although EAC had operated in the red from its inception. Ringer met that month with Sam Sarcinelli, later a key government witness, at a hotel in New York. At the time he testified, Sarcinelli had three previous felony convictions for tax, narcotics and firearms violations. He also had plead guilty to two counts of the indictment in the present case and had agreed to testify against the other defendants in return for the government's recommendation that his sentence be concurrent with those he was already serving. It came out at trial that in the early 1970's Sarcinelli had been barred by the SEC from dealing in securities and that he had lied under oath to the SEC in 1980.

At the time of the meeting with Ringer, Sarcinelli was involved in buying and selling stocks and cocaine. By all appearances he was a wealthy man, and Ringer originally approached him to obtain a loan, offering stock in EAC and other companies as collateral. According to Sarcinelli's testimony, the idea of a loan was soon superseded by a plan in which Sarcinelli would aid Ringer, Scop and Stone in "working" the EAC stock, artificially moving its price to a target of fifteen cents per share by means of a series of controlled purchases and sales at successively higher prices.

Sarcinelli also testified about another meeting with Ringer, Brustein and some of Sarcinelli's associates in a Los Angeles hotel in July 1980, at which the artificial inflation of the share price and a proposed misleading letter to EAC's stockholders concerning the company's prospects were discussed. According to Sarcinelli, he brought Bloom into the scheme a few weeks later.

Sarcinelli and his associates soon began bringing in customers for the stock and setting up "matched orders" or "matched trades" to be executed by Scop, Stone and Bloom. These "matched orders" involved Sarcinelli covering "both sides" of a trans-

action by providing the buyer, seller and price. Nevertheless, the stock price did not move as he had expected, reaching a price of no more than six cents per share. By late August or early September, Sarcinelli began to suspect that one of his partners was "back dooring" him by selling the stock on the open market, thereby undermining the scheme to control the stock's price. Sarcinelli severed all involvement in the scheme in November 1980.

After Sarcinelli withdrew, attempts to inflate the price of the stock appear to have ceased, and the stock generally declined, eventually becoming worthless. Nevertheless, after July 22, 1981, the critical date for purposes of the statute of limitations, defendants' nominees sold shares of EAC stock at prices that were still higher than what they had paid, defendants mailed stock certificates for purchases made in the previous year, and Bloom and Stone told nervous customers to hold on to their shares. Promised financial information on the company was never sent to shareholders despite requests.

### B. *Whitten's Expert Testimony*

The government called Stanley Whitten, the chief investigator for the SEC regional office in Chicago, as its final witness. Whitten had been a stockbroker for eight years prior to joining the SEC as an investigator in its Enforcement Division in 1974. He had spent over one thousand hours during four years of working on the present case and had interviewed approximately seventy witnesses. He had also assisted in the preparation of the indictment.

Whitten did not testify at trial as a witness with personal knowledge of relevant events. Claiming to be an expert in securities trading practices, he purported to base his testimony not on information obtained from his four-year investigation, but solely on the testimony and documentary evidence introduced at trial.

Whitten was allowed to answer over defense objections a question concerning his opinion as to whether there was a scheme to defraud investors in EAC stock from 1979 to 1982. He answered, "It is my opinion that the stock of European Auto Classics was manipulated and that certain individuals were active participants and material participants in the manipulation of that stock. And that these individuals engaged in a manipulative and fraudulent scheme in furtherance of that manipulation." Whitten consciously used the same formulation throughout his testimony. For example, when asked to name the "participants" in the scheme and the roles that they played, he corrected himself in mid-sentence to include the same elements in his answer: "I believe that the role at the inception, in terms of the participants and the manipulation—excuse me, the fraudulent manipulative practices that were engaged in...." He also repeatedly described the defendants as "active participants" and "material participants" in the manipulation of EAC stock. On cross-examination Whitten acknowledged that his positive assessment of the testimony of the government's witnesses, including Sarcinelli, was a basis for his opinions.

### DISCUSSION

### A. *Statute of Limitations*

The applicable statute of limitations for conspiracy, securities fraud and mail fraud is five years. 18 U.S.C. § 3282 (1982); *see United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir.1982) (conspiracy); *United States v. Jensen,* 608 F.2d 1349, 1355 (10th Cir.1979) (securities fraud); *United States v. Ashdown,* 509 F.2d 793, 797 (5th Cir.) (mail fraud), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). Defendants argue that their conspiracy convictions must be reversed because there was insufficient evidence of overt acts in furtherance of the conspiracy within the five-year period prior to the indictment. They also contend that within the limitations period, there was insufficient evidence of acts furthering the scheme to inflate artificially the price of EAC stock, or of mailings for the purpose of either executing the scheme or "lulling" victims to prevent them from complaining to the authorities. *See United*

*States v. Lane,* 474 U.S. 438, 451–52, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986).

■ We may quickly dispose of this claim. Defendants do not challenge the pertinent instruction given by the district judge but claim only that the evidence was insufficient as a matter of law. As we have frequently noted, a defendant bringing an insufficiency challenge "bears a 'very heavy burden,'" *United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986) (quoting *United States v. Davis,* 767 F.2d 1025, 1040 (2d Cir.1985)), and we must uphold the jury's guilty verdict if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *accord United States v. Worthington,* 822 F.2d 315, 319 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987).

While it is true that the great majority of criminal acts occurred prior to the limitations date of July 22, 1981, the evidence of continued stock purchases and sales at prices affected (or so the jury might find) by the earlier artificial trades, of the mailings of stock certificates, and of the reassurances to customers after this date was sufficient to permit a rational jury to conclude that the conspiracy and substantive scheme to defraud continued.

## B. *Whitten's Expert Testimony*

■ We agree with defendants that Whitten's repeated statements embodying legal conclusions exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence. It is true that Fed.R.Evid. 704 states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions. The Advisory Committee's Note thus states:

The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from "usurping the province of the jury," is aptly characterized as "empty rhetoric." 7 Wigmore, § 1920, p. 17. Efforts to meet the felt needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule. Thus a witness could express his estimate of the criminal responsibility of an accused in terms of sanity or insanity, but not in terms of ability to tell right from wrong or other more modern standard. And in cases of medical causation, witnesses were sometimes required to couch their opinions in cautious phrases of "might or could," rather than "did," though the result was to deprive many opinions of the positiveness to which they were entitled, accompanied by the hazard of a ruling of insufficiency to support a verdict. In other instances the rule was simply disregarded, and, as concessions to need, opinions were allowed upon such matters as intoxication, speed, handwriting, and value, although more precise coincidence with an ultimate issue would scarcely be possible.

Many modern decisions illustrate the trend to abandon the rule completely. *People v. Wilson,* 25 Cal.2d 341, 153 P.2d 720 (1944), whether abortion necessary to save life of patient; *Clifford–Jacobs Forging Co. v. Industrial Comm.,* 19 Ill.2d 236, 166 N.E.2d 582 (1960), medical causation; *Dowling v. L.H. Shattuck, Inc.,* 91 N.H. 234, 17 A.2d 529 (1941), proper method of shoring ditch; *Schweiger v. Solbeck,* 191 Or. 454, 230

P.2d 195 (1951), cause of landslide. In each instance the opinion was allowed.

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. *They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.* McCormick § 12.

Fed.R.Evid. 704 advisory committee's note (emphasis added).

Had Whitten merely testified that controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors, no sustainable objection could have been made. Instead, however, Whitten made no attempt to couch the opinion testimony at issue in even conclusory factual statements but drew directly upon the language of the statute and accompanying regulations concerning "manipulation" and "fraud". *See supra* note 1. In essence, his opinions were legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading. Moreover, because his opinions were calculated to "invade the province of the court to determine the applicable law and to instruct the jury as to that law," *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.), *cert. denied*, 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983), they could not have been helpful to the jury in carrying out its legitimate functions. "The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case." *Marx &*

*Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir.) (citation omitted), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Id.* at 509–10; *see also Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury."); *McCormick on Evidence* § 12 (3d ed. 1984); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 704[02] (1987); ABA Section of Litigation, *Emerging Problems under the Federal Rules of Evidence*, 217–29 (1983).

"Manipulation," "scheme to defraud," and "fraud" are not self-defining terms but rather have been the subject of diverse judicial interpretations. With regard to the term "manipulation," see *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283, 1294–95 (2d Cir.1976) (Mansfield, J., concurring) ("short form" merger without advance notice to minority shareholders amounts to manipulative device under Section 10(b)), *rev'd*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977) ("[m]anipulation is virtually a term of art" in the securities laws, and refers "to conduct artificially affecting market activity in order to mislead investors"; "breach of fiduciary duty by majority shareholders, without any deception, misrepresentation, or nondisclosure" does not constitute manipulation); *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 374–76 (6th Cir.1981) (act may be "manipulative" in connection with a tender offer under Section 14(e) of the Williams Act even where full disclosure if act artificially affects the market for, or price of, securities), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 568 F.Supp. 1538, 1559 (S.D.N.Y.) (under Section 14(e) manipulative acts are those "that unduly obstruct the exercise of informed shareholder choice"; act may be "manipulative" even where there has been full disclosure), *rev'd*, 722 F.2d 1, 4 (2d Cir.1983) (misrepresentation essential element of

cause of action under Section 14(e)), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985) ("manipulative" as used in Section 14(e) requires misrepresentation or nondisclosure). With regard to "scheme to defraud," see *United States v. Chiarella,* 588 F.2d 1358, 1365 (2d Cir.1978) (under Rule 10b–5 *"anyone . . .* who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose"), *rev'd,* 445 U.S. 222, 232–35, 100 S.Ct. 1108, 1116–18, 63 L.Ed.2d 348 (1980) (silence in connection with purchase and sale of security not fraud under Rule 10b–5 absent the existence of a prior duty to disclose arising out of a relationship imposing such duty); *United States v. Carpenter,* 791 F.2d 1024, 1028–34 (2d Cir.1986) (where defrauding party breaches duty of confidentiality owed to victim, liability may be imposed under Rule 10b–5 even though victim was not buyer or seller of securities or market participant), *aff'd by an equally divided Court,* — U.S. —, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987). With regard to the meaning of "fraud" under the mail fraud statute, see *United States v. Margiotta,* 688 F.2d 108, 123–26 (2d Cir.1982) (breach of "fiduciary" duty owed by political party official to public constitutes scheme to defraud), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983) (use of corporate funds by corporate fiduciary "in breach of . . . fiduciary dut[y] to act in the best interest of the corporation" constitutes scheme to defraud); *McNally v. United States,* — U.S. —, 107 S.Ct. 2875, 2879–81, 97 L.Ed.2d 292 (1987) (mail fraud statute limited to protection of property rights and does not reach scheme to defraud citizens of intangible rights to honest and impartial government).

The government argues, however, that Whitten's testimony was proper under three of our recent decisions upholding opinion testimony by government investigators. In *United States v. Carson,* 702 F.2d 351, 369–70 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983), two Drug Enforcement Agency agents were allowed to testify concerning their opinion that conduct they observed involved a narcotics transaction. Because "the clandestine manner in which drugs are bought and sold[ ] is unlikely to be within the knowledge of the average layman," *id.,* the conclusions of the agents based on their years of experience were held admissible under Rule 702. In *United States v. Young,* 745 F.2d 733, 760–61 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985), a police detective was allowed to testify, based on his observations, that he believed a narcotics transaction had taken place. In the same case, a DEA agent testifying as an expert witness was permitted to describe a typical chain of heroin distribution, including the characteristics and operating methods of a heroin "mill." The district judge instructed the jury that this general description was unrelated to the facts or circumstances of the particular case. The agent was then allowed to testify that what he found in defendant's apartment was precisely what he would have expected to find in a heroin "mill." *Id.* at 761. In *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), a police officer testifying as an expert was permitted to describe a typical drug buy in Harlem, including the role of the "steerer." He was then permitted to testify over objection that the defendant acted as a "steerer" in a transaction the officer had observed.

In each of these cases, we upheld the convictions. We noted in *Brown,* however, that "there is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted the pattern." *Id.* at 401. Nevertheless, the Advisory Committee's Note to Rule 704 cautions against limiting experts to "might or could" formu-

lations when they are prepared to say "did," and *Carson, Young* and *Brown* appear to be consistent with that admonition. Whether these results are desirable is not for us to say in light of the Rules' generally liberated approach to expert testimony.

None of our prior cases, however, has allowed testimony similar to Whitten's repeated use of statutory and regulatory language indicating guilt. For example, telling the jury that a defendant acted as a "steerer" or participated in a narcotics transaction differs from opining that the defendant "possessed narcotics, to wit, heroin, with the intent to sell," or "aided and abetted the possession of heroin with intent to sell," the functional equivalent of Whitten's testimony in a drug case. It is precisely this distinction, between ultimate factual conclusions that are dispositive of particular issues if believed, e.g., medical causation, and "inadequately explored legal criteria," that is drawn by the Advisory Committee's Note.

■ We turn now to a second fatal objection to Whitten's opinion testimony. On cross-examination, defense counsel brought out that Whitten's opinions were based on his positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses, in particular that of Sarcinelli. We believe that expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury, *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987), and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial. Even apart from the gross invasion of the province of the jury that Whitten's testimony represented, his only claim to expertise was limited to securities trading and did not encompass the evaluation of testimony. Moreover, even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible, *United States v. Azure*, 801 F.2d 336, 340–41 (8th Cir.1986), al-

though such witnesses may be permitted to testify to relevant physical or mental conditions. *See generally* Annotation, *Necessity and Admissibility of Expert Testimony as to Credibility of Witnesses*, 20 A.L.R.3d 684 (1968).

■ It is true that Rule 705 allows an expert to state an opinion without disclosing the basis for it, and that a cross-examiner thus may elect not to probe into whether an expert witness's personal assessment of other witnesses' credibility is a basis of the opinion. In a sense, therefore, defendants caused Whitten's credibility opinions to be exposed to the jury. Our objection to testimony on credibility is not limited, however, to the prejudicial effect such testimony may have on the jury. Rather, we believe that such testimony not only should be excluded as overly prejudicial but also renders inadmissible any secondary opinion based upon it. Our holding, therefore, is that witness *A* may not offer an opinion as to relevant facts based on *A*'s assessment of the trustworthiness or accuracy of witness *B* where *B*'s credibility is an issue to be determined by the trier of fact. Were we to rule otherwise, triers of fact would be called upon either to evaluate opinion testimony in ignorance of an important foundation for that opinion or to hear testimony that is otherwise inadmissible and highly prejudicial.

The present case exemplifies this dilemma. On the one hand, the jury could not accurately evaluate Whitten's testimony in ignorance of the fact that it was based in large part on his opinion that Sarcinelli was telling the truth. That judgment went well beyond the witness's purported expertise and vitiated whatever value his testimony had. On the other hand, testimony by one witness concerning the credibility of other testimony is objectionable in light of the presumption that the trier of fact is the best evaluator of credibility. Such testimony is thus not helpful to the trier of fact and is likely to be prejudicial.

Indeed, Whitten's offering of such an opinion was particularly objectionable. He had spent years investigating this case and had reached a conclusion well before trial

as to the credibility of the various witnesses and parties. We believe it to be virtually impossible for an investigator so deeply involved in a case to put aside previous judgments regarding the credibility of witnesses and to render de novo judgments on their credibility after listening to the trial. Even if Whitten had such a sharply compartmentalized mind as to allow segregation of his various credibility analyses, such testimony by an investigator and opinions based thereon are clearly prejudicial when offered to a jury. In *Young*, 745 F.2d at 766 (Newman, J., concurring), Judge Newman noted that a jury may infer from an investigating agent's opinion that the agent has knowledge about the defendant beyond the evidence offered at trial, an observation we commended to district judges in *Brown*, 776 F.2d at 401 & n. 6. Certainly, the risk of a jury believing that an opinion offered as to credibility by an agent such as Whitten was based on his investigation as a whole rather than solely on evidence adduced at trial is particularly great.

We find nothing in Rule 703 inconsistent with our ruling. That Rule permits inadmissible evidence to be the basis of an expert's opinion where it is of "a type reasonably relied upon by experts in the particular field." As the Advisory Committee's Note makes plain in its illustration of decisions by physicians, the purpose of the rule is to align the law with the extrajudicial "practice of experts" who may base their opinions on technically inadmissible evidence, such as unauthenticated x-rays and oral reports by nurses. The Rule in no way purports to allow witnesses to assess the trustworthiness or accuracy of *testimony given in the same case* or to offer opinions based on such an assessment.

■ Our ruling thus does not preclude use of an expert such as Whitten to testify to methods by which share prices may be artificially inflated. Simple hypotheticals based on assumptions about testimony in the record can also be posed to the witness in a way that allows his or her opinions to be given but leaves the credibility issues to the jury. *See generally* 3 J. Weinstein & M. Berger, *supra*, ¶ 705[01].

Our ruling thus also does not conflict with Rule 703's provision that the "facts or data in the particular case upon which an expert bases an opinion or inference may be thus ... made known to the expert at ... the hearing." Fed.R.Evid. 703; *see also* Fed.R.Evid. 703 advisory committee's note ("expert [may] attend trial and hear the testimony establishing the facts"). Where such facts or data are based on the trial testimony of a witness whose credibility is not in dispute, the expert need not make a judgment about credibility. Where the credibility of the witness is an issue, the expert may assume the truth of his or her trial testimony and thereafter offer an opinion based on the substance of the testimony. There is thus no need for an expert to make, much less state to the jury, an assessment of credibility when offering an opinion based on trial testimony.

## CONCLUSION

We have considered the arguments of Bloom and Stone relating to their convictions for perjury under counts fourteen and fifteen, and find them to be without merit. All convictions on counts one through thirteen are therefore reversed, and the convictions of Bloom and Stone for perjury under counts fourteen and fifteen are affirmed.

PIERCE, Circuit Judge, concurring:

I concur in all of Judge Winter's thorough opinion except for the portion discussing the "second fatal objection" to Whitten's expert testimony. A question remains in my mind as to whether Judge Winter's conclusion that "expert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony" is consistent with Rules 703 and 705 of the Federal Rules of Evidence and the Advisory Committee Notes. As I understand it, the expert's reliance on the testimony of a witness whose credibility is in question may be brought out on cross-examination and may not affect the foundation for admission of the opinion itself. *See, e.g., Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir.), *cert. denied*, 426 U.S. 907, 96

**144**

S.Ct. 2229, 48 L.Ed.2d 832 (1976); *Twin City Plaza, Inc. v. Central Surety and Ins. Corp.*, 409 F.2d 1195, 1200 (8th Cir. 1969); 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 705[01], at 705–6 to –10 (1987); McCormick on Evidence § 14, at 35 (E. Cleary 3d ed. 1984).

Nonetheless, since I agree with the primary objection to Whitten's testimony, namely, that Whitten's statements in the form of legal conclusions exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence, I concur in Judge Winter's conclusion that all of the appellants' convictions should be reversed except for the perjury convictions of Bloom and Stone.