OPINION
{¶ 1} This is an appeal by defendant, Lloyd W. Johnson, from a judgment of the Franklin County Court of Common Pleas, following a jury trial in which defendant was found guilty of felonious assault.
 {¶ 2} On October 20, 1999, defendant was employed as a security officer for Securities Strategies Unlimited. On that date, defendant was assigned to work at the Laurel Lakes Apartment complex. At approximately 11:30 p.m., defendant and another security officer, Robert Williams, were at the scene of a single vehicle accident, in which a pickup truck had veered off the road and damaged property at the apartment complex.
 {¶ 3} As they were investigating this accident, defendant heard "some yelling and screaming," and the "peeling of the tires." (Tr. 142.) Defendant observed an individual in a vehicle backing out of the parking lot and squealing his tires. Defendant began walking in the direction of the vehicle to tell the driver to slow down because "we still had people out and about that area." (Tr. 143.) Defendant shined his flashlight at the driver and yelled for him to stop the vehicle.
 {¶ 4} The driver stopped, and defendant "proceeded across the street." (Tr. 143.) Defendant testified that he was approximately three or four feet into the street, and as he was watching the driver "it was like a blank stare had caught across his face, and I watched him turn his hands and the steering wheel, and I seen the wheels and stuff of the car, and I hear the engine at the same time at which time, before I knew it, this guy was on top of me. And he hit me with his car, and I was on the — it's like the passenger side, the right front fender and the hood of the car." (Tr. 143.) Defendant further stated, "I landed on the curb. And I had drawn my weapon, and I fired two shots." (Tr. 144.) One of the shots entered the passenger side of the vehicle, striking the driver in the right forearm.
 {¶ 5} Defendant was "nervous and scared" at the time, fearing the driver was going to run over him. (Tr. 144.) When defendant first fired his weapon, the driver was "right beside" him. (Tr. 145.) Defendant fired the second shot when he saw the driver's brake lights; defendant testified that he "did not know if he was going to come back or not." (Tr. 146.) When defendant arrived home after the incident, he realized he had a red mark on his left leg. At trial, defendant introduced a photograph of his leg taken shortly after the incident. Defendant also testified that his pants were ripped as a result of the incident.
 {¶ 6} Dana Chaffin, the driver of the vehicle involved in the incident, testified on behalf of the state. On October 20, 1999, Chaffin was at the Laurel Lakes Apartment complex visiting his girlfriend, Brenda Cummings. That evening, Chaffin and Cummings got into an argument. Chaffin, who had consumed two or three beers, was "[a] little bit" mad when he left the apartment complex. (Tr. 21.) He got into his vehicle and backed out of the parking lot, squealing his tires down the driveway. Chaffin turned left out of the driveway onto Roche Drive.
 {¶ 7} As Chaffin turned the corner and headed straight down the street, the passenger side door glass of his car shattered, and he saw a flash. Chaffin's right arm was hurt and bleeding, but he did not realize at that time that he had been shot. Chaffin drove to his mother's house, approximately five minutes away from the apartment complex, and was subsequently transported to Riverside Methodist Hospital. Chaffin suffered a single gunshot wound to his right forearm, with the bullet also causing a graze wound to his left forearm.
 {¶ 8} During direct examination, Chaffin denied that he observed anyone attempting to stop him as he started down Roche Drive, and he also denied that he was attempting to run down anybody. On cross-examination, Chaffin acknowledged that he was angry when he left his girlfriend's apartment, and "[t]hat's why I squealed my tires out of there." (Tr. 38.) He also stated that he had no more than four beers that evening.
 {¶ 9} Shawn Scholz was called by the state as a witness. On October 20, 1999, at approximately 11:30 p.m., Scholz was at the Laurel Lakes Apartment complex helping a friend install a C.D. player in an automobile in the parking lot. Scholz observed two security guards in the complex that evening assisting a driver who had struck a telephone pole. Scholz later heard tires squealing and he looked across the parking lot and observed a "dark-colored car with its headlights on facing me." (Tr. 56.) The car "looked like it was going a little bit fast, but then it started to slow down as if to stop at the intersection to make the turn." (Tr. 57.) Scholz, who was working in the trunk area of the car, then heard a gunshot, and when he looked up from the trunk he saw one of the guards fire a second shot toward the car. Scholz did not observe the car come in contact with the guard, but stated, "[m]y head was in the trunk when this might have happened." (Tr. 61.) Scholz further stated, from "[w]here the security guard was standing * * * the car coming towards that intersection would be heading directly towards the security officer." (Tr. 62.)
 {¶ 10} Columbus Police Detective Michael Higgins investigated the shooting at the Laurel Lake's apartments. Detective Higgins identified photographs taken of Chaffin's vehicle after the shooting. Detective Higgins noted what appeared to be a single bullet hole in the rear taillight of the car. Detective Higgins interviewed defendant shortly after the shooting, and the detective obtained a nine-millimeter pistol from defendant.
 {¶ 11} Detective Higgins stated that, in order to fire a bullet into the side window of the car "the shooter would have to be in the approximate area directly in front of the passenger side door pointing the weapon at the window." (Tr. 81-82.) He stated that there was no evidence that the person firing the weapon would have been in front of the car at any time while firing.
 {¶ 12} Detective Higgins testified that the Ohio Peace Officers Training Academy ("OPOTA") is the certifying body for firearms carried by police officers and/or security guards, and that OPOTA trains individuals in principles regarding the use of deadly force. Detective Higgins was familiar with the statement that "the use of deadly force needs to be logical, reasonable, and necessary." (Tr. 83.) Detective Higgins stated, "[y]ou can't apply deadly force after the fact. You have to be in immediate fear for your own well-being or of another and use deadly force in an attempt to prevent that action from occurring." (Tr. 83.) Detective Higgins further stated that there must be intent by the actor to cause death or serious bodily injury.
 {¶ 13} During direct examination, the prosecutor asked Detective Higgins why he sought charges against defendant in the instant case. Detective Higgins responded, "I felt that * * * the first shot — what I am speculating to be the first shot through the window, that the car had already — was in the process of passing the security officer and was — there was no threat of death or serious bodily injury at that point." (Tr. 86.) Further, Detective Higgins stated that "the second shot, which appeared to go into the rear taillight of the vehicle, indicated that the vehicle had already passed the shooter and was — again, I'm speculating — was fired for reasons other than, you know, protection of himself or another." (Tr. 86.)
 {¶ 14} The prosecutor also asked Detective Higgins, based upon his review of the evidence, including the layout of the scene and discussions with officers, whether he would have fired his weapon in that situation. Detective Higgins opined that he would not have fired a weapon under those circumstances.
 {¶ 15} Columbus Police Officer Isaac J. Moore also testified on behalf of the state. Officer Moore investigated the shooting incident and interviewed defendant shortly after the events. Defendant told the officer that he and another security guard were standing near an earlier accident scene on Roche Drive when he heard squealing tires from a car in the parking lot. Defendant informed the officer that he approached the vehicle to tell the driver to slow down and "at that time he said he was struck by the vehicle and in return fired two shots." (Tr. 107.) Defendant related that, "when he approached the vehicle, the driver hit him with the vehicle and knocked him onto the hood of the car." (Tr. 111.) Officer Moore asked defendant whether or not he actually shot the motorist. Defendant initially did not respond, but then stated, "[w]ell, I would hope so." (Tr. 107.) Defendant then told the officer that he thought he shot the motorist in the chest.
 {¶ 16} Officer Moore questioned defendant about where he was standing when he shot at the motorist. Defendant took the officer to "the east side of Roche Drive in the grassy area just east of the street," beyond the curb. (Tr. 110.) Defendant indicated to the officer that the vehicle struck his left leg.
 {¶ 17} During direct examination, the prosecutor asked Officer Moore, based upon his review of the physical evidence and the information defendant related to him, whether he would have fired at the motorist. Officer Moore responded, "[n]o, sir, I don't believe I would have." (Tr. 116.) On cross-examination, Officer Moore acknowledged that he had never been involved in a shooting incident.
 {¶ 18} Jim Burcham, part owner of Security Strategies Unlimited, testified on behalf of defendant. Burcham's company conducted a background check of defendant prior to the time he was hired, indicating no prior criminal record; defendant was licensed to carry a firearm pursuant to R.C. 4749.10.
 {¶ 19} On the date of the incident, Burcham was at the Laurel Lakes Apartment complex to assist other security personnel, including defendant, following a report of a one-vehicle accident on the apartment property. Burcham was talking with some apartment residents when he heard "a car peeling out and what I perceived to be a single gunshot." (Tr. 186.) Burcham stepped out of the apartment and looked toward the street. He observed defendant "out in the street, and a car was speeding down Roche Drive headed towards the Elephant Bar or towards 161." (Tr. 187.) Burcham called the company's dispatcher, and reported that a car "had possibly just hit one of our officers." (Tr. 187.)
 {¶ 20} Burcham then went to where defendant was standing, and defendant told Burcham "that the car attempted to hit him and that he had hit him in the leg but that he was okay." (Tr. 187.) Defendant told Burcham that he shot at the driver because he thought the motorist was attempting to run him over. Burcham then tried to calm down defendant, who was "distraught" and "upset." (Tr. 187.) On cross-examination, Burcham testified that defendant told him at the time that the car scraped him, but defendant did not indicate that he was thrown onto the hood of the car.
 {¶ 21} On June 1, 2000, defendant was indicted on one count of felonious assault, in violation of R.C. 2903.11. The indictment also carried a firearm specification. The case was tried before a jury beginning on March 12, 2002. Following the presentation of evidence, the jury returned a verdict finding defendant guilty of felonious assault, as well as the firearm specification.
 {¶ 22} On appeal, defendant sets forth the following three assignments of error for review:
 {¶ 23} "[I.] The defendant was deprived of his right to have the jurors apply the correct standard of law to their deliberations when:
 {¶ 24} "(1) Police officers were improperly allowed to testify as expert witnesses and they misstated the law regarding the justification for using deadly force and improperly rendered opinions that the defendant was not justified in using such force. This had the legal effect of directing the jurors to return a verdict of guilty.
 {¶ 25} "(2) The state improperly misrepresented the law when it argued and presented testimony indicating that the defendant had no authority to approach the vehicle, was therefore at fault for creating the situation, and thus could not claim self-defense.
 {¶ 26} "(3) The state improperly argued, and had the court instruct the jurors, that the defendant was not entitled to the same privileges and immunities in the use of deadly force as are police officers.
 {¶ 27} "(4) The jurors were instructed that the only justification for the use of deadly force was in self-defense and were never instructed on the justification for using deadly force to halt a dangerous, violent felon.
 {¶ 28} "[II.] The defendant was deprived of his right to a fair trial and the effective assistance of counsel as a result of improper questions and assertions that were asked and made by the prosecutor and as a result of the failure of his attorney to object to most of them.
 {¶ 29} "[III.] The defendant was denied his right to confront and cross-examine the witnesses against him when the judge refused to allow the defendant to cross-examine an expert witnesses about actual knowledge that he possessed that was inconsistent with his stated opinion."
 {¶ 30} Under defendant's first assignment of error, we will initially address defendant's contention that law enforcement officers were improperly permitted to testify as expert witnesses and express their opinions regarding the validity of defendant's self-defense claim. Defendant further asserts that the officers misstated the law regarding the justification for using deadly force.
 {¶ 31} As noted under the facts, during direct examination, the prosecutor questioned both Detective Higgins and Officer Moore, based upon their experience as law enforcement officers, whether they would have fired at the motorist if they had been faced with the same facts and circumstances as shown by the evidence. Both witnesses rendered opinions that they would not have shot at the driver. Also during the trial, the prosecutor elicited testimony from Detective Higgins as to why he pursued charges against defendant, and the detective opined that, at the time defendant fired the shots, there was no threat of death or serious bodily injury to him. Defendant asserts that it was error to allow the officers to render their personal and expert opinions that defendant's use of force was not legally justified, nor were their opinions properly a matter for expert testimony.
 {¶ 32} In State v. Berry (June 23, 1988), Franklin App. No. 87AP-924, this court discussed the rules governing the use of opinion testimony by both lay witnesses and expert witnesses:
 {¶ 33} "Certainly, opinion testimony is not rendered inadmissible per se because it pertains to an ultimate issue. Evid.R. 704; State v. Rohdes (1986), 23 Ohio St.3d 225, 229. However, such testimony in the form of an opinion must be `otherwise admissible.' Evid.R. 704 per Evid.R. 701 or 702.
 {¶ 34} "If the opinion testimony is offered by a lay witness, the opinion must be (a) rationally based on the witness' own perceptions, and (b) helpful to a clear understanding `of his testimony' or the determination of a factual issue. Evid.R. 701. (Emphasis added.) If the opinion is elicited from an expert witness, he must be `qualified' as such and provide `scientific, technical, or other specialized knowledge' which will assist the jury in understanding the evidence or determining a fact. Evid.R. 702; Lee v. Baldwin (1987), 35 Ohio App.3d 47."
 {¶ 35} We will first consider the propriety of the opinions rendered by Detective Higgins and Officer Moore that they would not have fired at the motorist based upon the evidence presented. At the outset, we agree with defendant's contention that the practical effect of the questions posed by the prosecutor was to call for an expert opinion from the witnesses, based upon their law enforcement background, going to the ultimate issue in the case, i.e., whether defendant acted in self-defense. At a minimum, the inference to be drawn from the opinions elicited was that defendant's conduct in firing at the motorist was unreasonable under the circumstances.
 {¶ 36} To the extent that it could be argued that these witnesses were not testifying as experts, the court finds that the opinions expressed did not constitute permissible lay opinions under Evid.R. 701. We note that neither Detective Higgins nor Officer Moore actually witnessed the incident, nor can it be held that this opinion testimony aided the trier of fact in determining the ultimate issue. It has been stated that, "[a]lthough testimony which embraces an ultimate issue is not objectionable (Fed.R.Evid. 704), seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an `oath helper.' " Mitroff v. Xomox Corp. (C.A.6, 1986), 797 F.2d 271, 276. See, also, Hogan v. American Telephone Telegraph (C.A.8, 1987), 812 F.2d 409, 411 ("Opinion testimony is not helpful to the factfinder if it is couched as a legal conclusion," and the requirement of "helpfulness" under Evid.R. 701 "assures against admitting opinions which would in essence tell the factfinder what result to reach"); Bensen v. American Ultramar Ltd. (S.D.N.Y. 1996), No. 92 CIV 4420 (KMW) (NRB) (while Evid.R. 701 does not limit subject matter of opinions, "it allows a judge to exclude `ultimate legal opinion,' or opinions calculated to instruct the jury as to their verdict").
 {¶ 37} The opinions expressed by the witnesses were also not proper expert testimony under Evid.R. 702. The Ohio Supreme Court has held that "expert testimony is inadmissible if it concerns matters `within the ken of the jury[.]'" State v. Sallie (1998), 81 Ohio St.3d 673, 676. See, also, State v. Coulter (1992), 75 Ohio App.3d 219, 228 ("When an issue of fact is within the experience, knowledge, and comprehension of the trier of fact, expert opinion testimony on that issue is unnecessary and inadmissible since it would not assist the trier of fact in understanding the evidence or determining a fact in issue").
 {¶ 38} In the context of a claim of justification based on self-defense, and whether a defendant acted reasonably under the circumstances, courts have held that "this issue is generally not a proper subject for expert testimony because `the question of reasonableness is quintessentially a matter of applying the common sense and the community sense of the jury to a particular set of facts and, thus, it represents a community judgment.' " State v. Salazar (1995),898 P.2d 982, 988, quoting Wells v. Smith (D.Md. 1991), 778 F. Supp. 7,8. Accordingly, "[b]ecause jurors are capable of determining whether the use of force in self-defense is reasonable, expert testimony bearing on that issue is generally inadmissible." Salazar, supra, at 988.
 {¶ 39} In the present case, there was no dispute that defendant fired twice at Chaffin's vehicle, and that one of the shots struck the victim in the arm. The critical issue before the jury was whether defendant acted in self-defense in firing at the motorist. The jury had before it testimony concerning the direction of the shots, the position of defendant in relation to the vehicle when he fired the shots, and whether the car came toward defendant as it exited the apartment complex. The state's theory was that defendant was in the grass, beyond the curb, when he fired at the vehicle, and that he was not in imminent danger of serious bodily harm. Defendant testified that he proceeded into the street and approached the driver, that the vehicle came toward him and struck him, and that he fired the shots out of fear that the driver was attempting to run him down. In this case, the physical evidence related to the shooting as well as the credibility of defendant's testimony that the vehicle came toward him and struck him, and that he acted out of fear for his life, were matters within the comprehension of the average juror. Thus, the opinion testimony introduced, going to the ultimate issue of whether defendant acted reasonably under the circumstances, did not meet the requirements of Evid.R. 702. See, e.g., Hygh v. Jacobs (C.A.2, 1992), 961 F.2d 359, 364 (expert's testimony that police officer's conduct "was `not justified under the circumstances,' not `warranted under the circumstances' and `totally improper'" went to ultimate legal conclusion entrusted to the jury and should have been excluded).
 {¶ 40} Further, the opinion testimony regarding what these law officers would have done under the circumstances was irrelevant. Ohio law employs a subjective test in self-defense cases; accordingly, "the reasonableness of the accused's beliefs and actions are determined on a case-by-case basis, and there are no objective `thresholds' or `reasonable person' standard." State v. Daws (1994), 104 Ohio App.3d 448,470. Moreover, the danger exists that the jury will give opinion testimony of law enforcement officers, based upon their background and experience, such "an aura of trustworthiness and reliability" that the jury will simply adopt the experts' conclusions "rather than making its own decision." Specht v. Jensen (C.A.10, 1988), 853 F.2d 805, 809. Thus, even assuming relevancy, the testimony at issue was excludable because any potential value was "substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403.
 {¶ 41} This court also finds improper opinion testimony by Detective Higgins regarding why he sought charges against defendant, in which the detective stated he "felt that * * * the first shot — what I am speculating to be the first shot through the window, that the car had already — was in the process of passing the security officer and was — there was no threat of death or serious bodily injury at that point." (Tr. 86.) Detective Higgins also testified that the second shot, "which appeared to go into the rear taillight of the vehicle, indicated that the vehicle had already passed the shooter and was — again, I'm speculating — was fired for reasons other than * * * protection of himself or another." (Tr. 86.) As previously discussed, the evidence surrounding the shooting incident involved issues of fact within the comprehension of the trier of fact, and the jurors did not require the detective's testimony, in the form of a legal conclusion, to reach their own conclusions regarding defendant's self-defense claim.
 {¶ 42} Upon review, we agree with defendant's contention that the jury heard improper opinion testimony going to the crucial issue of whether defendant was justified in his actions. Because no objection was made to this testimony, we must still consider whether plain error occurred. Plain error has been defined as "obvious error prejudicial to a defendant, neither objected to nor affirmatively waived by him, which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings." State v. Craft (1977), 52 Ohio App.2d 1, 7. Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The Ohio Supreme Court has interpreted the "substantial rights" aspect of the rule to mean, "the trial court's error must have affected the outcome of the trial." State v. Barnes (2002), 94 Ohio St.3d 21, 27.
 {¶ 43} In the instant case, we conclude that the error affected the substantial rights of defendant. As discussed above, the improper opinion testimony of the officers went to the heart of defendant's self-defense claim, and therefore to the issue of his guilt. The effect of the testimony was to invade the province of the jury and lend credibility to the state's case while discrediting defendant's testimony. Further, we agree with defendant's contention that error in the admission of this evidence was compounded by Detective Higgins's testimony as to the applicable law governing the use of force in self-defense situations, including his statements that the person using deadly force must show that his assailant had intent to cause him death or serious bodily harm, and that the accused must show that the assailant had the opportunity, means or the ability to cause the intended harm. This testimony did not comport with the instructions given by the trial court on self-defense, and constituted inadmissible opinion testimony on the applicable legal standard. See United States v. Scop (C.A.2, 1988),846 F.2d 135, 140 (prejudicial error to allow witness to give expert legal testimony "calculated to `invade the province of the court to determine the applicable law and to instruct the jury as to that law' "). Here, "[e]ven if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard — explicit or implicit — to the jury." Hygh, supra, at 364. Moreover, while a witness may be uniquely qualified by experience to assist the trier of fact, "he is not qualified to compete with the judge in the function of instructing the jury." Id. See, also, Marx Co. v. Diner's Club, Inc. (C.A.2, 1977), 550 F.2d 505, 509-510 ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge").
 {¶ 44} Upon review of the record, we are unable to conclude that the admission of the opinion testimony at issue did not affect the outcome of the trial. Therefore, finding plain error, defendant's conviction must be reversed and the matter remanded for a new trial. Accordingly, defendant's first assignment of error is sustained to the extent provided above.
 {¶ 45} In light of the above, the remaining issues raised under defendant's first assignment of error are moot. Further, defendant's second and third assignments of error are also rendered moot.
 {¶ 46} Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed and this matter is remanded for a new trial in accordance with the above opinion.
Judgment reversed and cause remanded.
TYACK, P.J., and LAZARUS, J., concur.