Samuel M. ROBERTS, Plaintiff,

v.

LOS ALAMOS NATIONAL SECURITY, LLC, Defendant, Third–Party Plaintiff,

v.

University of Rochester, Third–Party Defendant.

11–CV–6206

United States District Court, W.D. New York.

Signed 10/02/2017

Louis J. Micca, Pittsford, NY, William Clauss, Rochester, NY, for Plaintiff.

Beryl Nusbaum, Greta Katrin Kolcon, Woods Oviatt Gilman LLP, Rochester, NY, for Defendant, Third–Party Plaintiff.

Eric J. Ward, William R. Leinen, Ward Greenberg Heller & Reidy LLP, Rochester, NY, for Third–Party Defendant.

## DECISION & ORDER

## INTRODUCTION

DAVID G. LARIMER, United States District Judge

This action arises out of an accident that occurred at the Laboratory for Laser Energetics ("LLE"), which is part of the University of Rochester ("UR") in Rochester, New York. On August 6, 2008, plaintiff Samuel Roberts, a UR employee, was working at the LLE, conducting an experiment. An accident occurred during the experiment, and plaintiff was severely injured.

Pursuant to a Cooperative Agreement between UR and the United States Department of Energy ("DOE"), as a condition of UR's receipt of federal funds from DOE, UR agreed to make the LLE available to outside users, for certain types of experiments, subject to UR's approval of the specifics of the proposed experiment. Once approved, the experiments would actually be conducted by UR employees, using UR's equipment.

At the time of the accident in question, plaintiff was conducting an experiment that had been proposed by Dr. Hans Herrmann, an employee of Los Alamos National Security, LLC ("LA"). The experiment had been approved by UR. During the experiment, an explosion occurred, and a piece of equipment fell on plaintiff, causing permanent injuries.

Barred by New York Workers Compensation Law from bringing a direct action against his employer UR, plaintiff filed an action in New York State Supreme Court, Monroe County, on March 7, 2011, against LA and Herrmann. LA removed the action to this Court on April 18, 2011, based on diversity of citizenship under 28 U.S.C. §§ 1332 and 1441(a).

On July 26, 2011, plaintiff filed an amended complaint, dropping Herrmann as a defendant and adding two other defendants: the Massachusetts Institute of Technology ("MIT"); and AWE, plc ("AWE") (Dkt. # 8). Plaintiff alleged that MIT and AWE had some involvement in the experiment.

LA filed an answer to the amended complaint, as well as a third-party complaint against UR, seeking contribution or indemnification from UR for any damages owing to plaintiff from LA. (Dkt. # 10.)

All the defendants moved for summary judgment. At that time, discovery was not complete, but the defendants contended that the record demonstrated their entitlement to judgment in their favor.

On April 26, 2013, this Court issued a Decision and Order granting summary judgment for defendants and dismissing plaintiff's complaint in its entirety. 942 F.Supp.2d 359. On appeal, the Court of Appeals for the Second Circuit affirmed the dismissal of plaintiff's claims against AWE and MIT, but reversed and remanded as to plaintiff's claims against LA. 573 Fed.Appx. 29 (2d Cir. 2014). The Second Circuit held that there were genuine disputes concerning whether LA owed a duty to plaintiff. *Id.* at 32.

The Circuit's decision was limited. It did *not* hold that LA was liable to plaintiff:

> Because Los Alamos will remain in this case, summary judgment should not have been granted to the University, which is a third-party defendant and the entity that bears substantial responsibility for the tragic injuries that Roberts suffered. We wish to make clear that we do not hold that Los Alamos owed Roberts a duty of care; rather, we conclude that there are genuine factual disputes that affect the determination of whether Los Alamos owed Roberts a duty and, therefore, Los Alamos is not entitled to summary judgment.

573 Fed.Appx. at 34.

Further proceedings ensued, including extensive discovery. Following that discovery, the parties filed additional motions.

There are eight motions now pending before the Court. All three parties have moved for summary judgment. Plaintiff seeks summary judgment against LA on the issue of liability (Dkt. # 157). LA seeks summary judgment dismissing plaintiffs' claims against it (Dkt. # 154). UR seeks summary judgment dismissing plaintiff's claims against LA, and correspondingly, LA's cross-claims against UR (Dkt. # 152).

The parties have also filed several motions related to their summary judgment motions. LA has moved to strike plaintiff's summary judgment motion on the ground that it is time-barred (Dkt. # 158). UR has moved for an order striking the report and affidavit of plaintiff's designated expert, Carl Abraham, which plaintiff filed in opposition to UR's motion for summary judgment (Dkt. # 165). LA has also moved to disqualify Abraham from testifying on plaintiff's behalf (Dkt. # 174).

Plaintiff has moved for leave to call Abraham as an expert witness in his case in chief, and to strike the affidavit of LA's expert, Roger Shrouf, which LA submitted in support of its motion for summary judgment and in opposition to plaintiff's motion for summary judgment. (Dkt. # 167.) Plaintiff has also moved to strike the affidavit of David Meyerhofer, which LA filed in support of its motion to disqualify Abraham (Dkt. # 178).

## FACTUAL BACKGROUND

Pursuant to UR's Laser Facility Organization & Regulation Manual ("LFORM"), a "Principal Investigator" ("PI"), which is defined as an "individual[ ] responsible for proposing experiments to be conducted on [UR's] OMEGA Laser System," must submit various forms. These include a "proposal template," which describes the experiment, and a "shot request form" ("SRF"). The SRF sets forth a menu of lab equipment (commonly referred to as "diagnostics"), the use of which may be requested for conducting the experiment at the UR facility.

A proposal must also identify any "unqualified" or "non-qualified" diagnostics. *See* Dkt. # 152–5 at 14.[1] Specifically, the LFORM states that "[a]ny non-LLE supported diagnostics or unqualified diagnostics should be separately identified" in the proposal. *Id.* The LFORM defines "non-qualified diagnostics" as "those that have not completed facility qualification per LLE Instruction 7700 and are not generally selectable on the SRF." *Id.* § 4.2.1.7. Instruction 7700 provides specific procedures that must be followed to fully qualify *new* equipment for use, including acquisition, assembly, fit and function tests and qualification testing, during which the laser equipment is operated under the antic-

---

1. The LFORM seems to use the terms "unqualified" and "non-qualified" interchangeably. *See* Dkt. # 152–5 at 14, §§ 4.2.1.3, 4.2.1.7.

ipated shot conditions, and evaluated. *See* Dkt. # 152–5 Ex. 13. No such testing is required for diagnostics and equipment which have already been qualified and are listed as such by UR.

With respect to the experiment in question, Dr. Herrmann was the Pl. He submitted an experiment proposal in June 2008, which was approved by the LLE on June 19. *See* Dkt. # 152–6 at 36, 48. Neither the proposal, nor Herrmann's SRF, identified any new or non-qualified diagnostics. At the time the proposal was submitted, the LLE's High Yield Neutron Temporal Device ("HYNTD"), also colloquially referred to as a "light pipe," was listed as a selectable device on the LLE's shot request form. *See* Dkt. # 152–7 at 6.

Herrmann has testified that he requested that Dr. Vladimir Glebov, a UR employee who worked at the LLE, to "run the light pipe pressurized with CO2" during the experiment. Dkt. # 152–4 at 103. It was at Glebov's request that the HYNTD had been added to the SRF database as a selectable diagnostic. *See* Dkt. # 152–6 at 34.

During the experiment, Glebov instructed plaintiff to decrease the CO, pressure in the light pipe from 100 to 50 psi. UR's Statement of Undisputed Facts (Dkt. # 152–2) ¶ 27; Plaintiff's Response to UR's Statement of Undisputed Facts (Dkt. # 157–16) at 1. Plaintiff received permission from the "Shot Director," who was a UR employee, to carry out Glebov's instructions. Dkt. # 152–2 ¶ 29; Dkt. # 157–16 at 1. As plaintiff was decreasing the pressure in the light pipe, there was an accident involving the light pipe. In the accident, the light pipe structure fell from its support, striking plaintiff and causing his injuries.

According to a preliminary post-incident report ("Report") that was issued following an internal UR investigation, it was at or around the time of the reduction in pressure that the accident occurred. The Report states that other UR employees who were present at the time recalled hearing a "loud bang, a gas pressure release, and a crashing sound." They found plaintiff lying on the floor, face down, unconscious and bleeding. The Report suggests that the underlying cause of the accident related to the decrease in pressure in the light pipe, and the authors also concluded that "the Light–Pipe structure fell from its support due the [sic] use of inadequate mounting bolts ...." Dkt. # 152–7 at 10.

## DISCUSSION

### I. Motions for Summary Judgment

All the parties have moved for summary judgment The crux of the dispute, as to all those motions, centers on the LFORM's requirement that "principal investigators" list in their experiment proposals any diagnostics that have not been "qualified" for use.

This Court's resolution of that dispute is necessarily informed by the Second Circuit's 2014 decision in this case. In that decision, the Second Circuit wrote that "[t]he evidence ... would allow a reasonable factfinder to conclude that the light pipe was not qualified. Because there is a genuine dispute concerning whether the light pipe was qualified, there is also a genuine dispute as to whether Dr. Herrmann was required to list the light pipe on his experiment proposal as a non-qualified diagnostic." 573 Fed.Appx. at 32. The Second Circuit also held that "a reasonable factfinder could conclude that the LFORM imposed a duty on Dr. Herrmann to ensure that the light pipe was qualified prior to the experiment in which Roberts was injured, even if Dr. Herrmann was not personally responsible for qualifying the light pipe." *Id.* at 33.

In reaching that conclusion, the Court of Appeals observed that "a court can 'impose a duty where none existed before,' so long as it exercises 'extreme care" ' in doing so. *Id.* at 33 (quoting *Vogel v. W. Mountain Corp.*, 97 A.D.2d 46, 470 N.Y.S.2d 475, 477 (3d Dep't 1983)). The court added that

[i]f a new duty of care were to be imposed, "[a]n important criterion is whether the realities of every day experience demonstrate that the party to be made responsible could have prevented the negligent conduct." *Id.* The genuinely disputed facts with respect to Dr. Herrmann's obligations under the LFORM are material to our determination of whether he could have prevented the accident and, therefore, whether we would conclude that he owed a duty to Roberts.

*Id.*

In essence, the Second Circuit held that at that stage of the case, there were genuine issues of fact as to whether Los Alamos owed plaintiff a duty. *Id.* at 34. But, as stated, the court did not hold that those issues necessarily had to go to trial. The court's holding was based on the record as it then existed. *See id.* at 32 (stating that "there are genuine disputes of material fact that prevent us from deciding *at this stage of the litigation* whether, as a matter of law, Los Alamos owed Roberts a duty of care") (emphasis added). The record has been greatly supplemented and fleshed out since then.

Plaintiff contends that the Second Circuit's decision constitutes the "law of the case." In a general sense, of course, it does. But with respect to the central issue here of whether LA owed plaintiff a duty with respect to the light pipe, the Court of Appeals' decision plainly left that an open question, and did not foreclose further consideration of that issue by this Court, following further discovery. The Second Cir-

cuit simply remanded the case for further proceedings consistent with the terms of its order, and that order did not foreclose the possibility that summary judgment could appropriately be granted at a later date, upon a more complete record.

In that regard, it is worth noting that in opposition to UR's first summary judgment motion, plaintiff pointed out that UR had "brought its motion at the earliest stage of the discovery process." Dkt. # 63-10 at 5. At that time, plaintiff was at pains to call attention to how little discovery had taken place, and how much remained to be done.

That was in October 2012. Since then, extensive discovery has occurred, and the parties have submitted a substantial body of evidence, comprising hundreds of pages, in connection with the pending motions for summary judgment. Since all three parties have moved for summary judgment, the one thing they apparently agree on is that the record is complete and sufficient for the Court to rule as a matter of law on the issues before it: in particular, the issue of whether Dr. Herrmann owed a duty to plaintiff.

■ What that evidence now demonstrates, in this Court's view, is that neither LA nor Dr. Herrmann owed plaintiff a duty with respect to the underlying events in this case. Dr. Herrmann had no reason to question whether the light pipe had been "properly" qualified, nor any reason to think that it should be identified as a non-qualified diagnostic. Nor was there any reason to question whether proper bolts had been used by UR employees in anchoring the light pipe. The undisputed facts make it equally apparent that Dr. Herrmann was not in a position to have prevented this accident. The LLE, and the equipment at the LLE, were at all relevant times under the control of UR.

Whether a duty of care exists is generally a question of law for the court, *Guzman v. Wackenhut Corp.*, 394 Fed. Appx. 801, 803 (2d Cir. 2010), although the answer to that question can depend on the underlying facts. *See, e.g., Kloner v. United States*, 196 F.Supp.3d 375, 386 (E.D.N.Y. 2016) ("the assumption-of-duty inquiry is necessarily fact-specific"). If a duty exists, then it is for the finder of fact to determine whether the duty was breached and if so, whether that breach proximately caused the plaintiff's injury. *Guzman*, 394 Fed.Appx. at 803. *See also Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) ("The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts") (quoting *Sanchez v. State of New York*, 99 N.Y.2d 247, 252, 754 N.Y.S.2d 621, 784 N.E.2d 675 (2002)).

The existence of a duty here, on the part of LA (acting through its employee Dr. Herrmann) turns in part on whether the light pipe/HYNTD was a non-qualified diagnostic. If it was, then under the LFORM it was supposed to be listed as such on the experiment proposal.

The LFORM defines "non-qualified diagnostics" as "those that have not completed facility qualification per LLE Instruction 7700 and are not generally selectable on the SRF." In retrospect, UR candidly states that the light pipe at issue in this case should have gone through a more rigorous testing process before being listed as a selectable device on the SRF, but it is undisputed that it did appear on the SRF, at the time that Dr. Herrmann submitted his experiment proposal. According to UR, at the time of the accident, the LLE considered the light pipe to be qualified, and there was no reason for Dr. Herrmann or LA to think otherwise. Plaintiff has failed to rebut that assertion. The

evidence indicates that had Herrmann identified the light pipe as "non-qualified," UR would have found no basis for further testing, since in UR's view it had already been "qualified," and the experiment would have proceeded in exactly the same way.

In opposition to UR's motion, plaintiff admits that the HYNTD "did appear on the SRF database," but contends that this "disprov[es] the notion that non-qualified diagnostics do not appear on the SRF database." Dkt. # 157–16. That is circular reasoning. Plaintiff assumes that the HYNTD was not qualified, and then argues from that premise that its listing on the SRF database proves that non-qualified diagnostics appeared on that database.

At most, construing the record most favorably to plaintiff, the evidence indicates that the HYNTD should not have been deemed qualified by the persons responsible for that decision at the LLE, and therefore should not have been listed on the SRF database in the first place. But that is hindsight. I see no basis in the record upon which a factfinder could reasonably conclude that Dr. Herrmann or LA could have known or even suspected that, or that they had an obligation to question the LLE's listing of the HYNTD on the SRF database.

As noted, in its 2014 decision in this case, the Second Circuit cited *Vogel v. W. Mountain Corp.*, 97 A.D.2d 46, 470 N.Y.S.2d 475 (3d Dep't 1983), for the proposition that a court can "impose a duty where none existed before," so long as the court exercises "extreme care" in doing so. 573 Fed.Appx. at 33. Significantly, however, the *Vogel* court did *not* impose a new duty in that case. *Vogel* involved the question of whether the sponsor of an athletic event, held at a ski slope, could be held liable in negligence for an injury to a participant in the event. The court answered that question in the negative, stat-

ing that "mere sponsorship, absent control, does not render [the defendant] legally responsible." 97 A.D.2d at 47–48, 470 N.Y.S.2d 475.

In its analysis of the facts before it, the court in *Vogel* stated that the defendant was not in a position, as a practical matter, to supervise the conduct of the event in question. The court noted that the owner of the ski slope "actually designed, supervised and controlled the event." *Id.* at 49, 470 N.Y.S.2d 475, 477. In so holding, the court referenced the fundamental principle that "absent a duty, there is no breach and, without a breach, there is no liability." *Id.* at 48, 470 N.Y.S.2d 475, 477.

For similar reasons, on the factual record that has now been presented to this Court, I conclude that LA owed plaintiff no duty with respect to the light pipe, since LA had no direct oversight of the conduct of the experiment in which plaintiff was injured. The experiment was conducted under the auspices and control of UR, using equipment that UR made selectable on the SRF.

Plaintiff's theory of liability is apparently based on the premise that LA-or its agent, Dr. Herrmann-had a duty to verify that the diagnostics sought to be used had not only been listed on the SRF database, but that they had been *properly* listed according to the LFORM: that is, that they had been fully tested and qualified under Instruction 7700, and that they were "generally selectable" on the SRF. There is no basis in the record for imposing such a duty on LA, or any other entity seeking to use the UR facility.

In seeking to find a basis for such a duty, plaintiff has tried to generate a good deal of metaphorical smoke, but there is no fire. Plaintiff quotes at length Dr. Herrmann's deposition, at which he admitted that he never saw the HYNTD prior to the accident, and that he did not make any inquiries as to whether it had been properly qualified. That has never been denied. The central question in this case is not whether Dr. Herrmann made some independent verification of whether the light pipe had been properly qualified, according to UR's internal qualification procedures, but whether he (and LA) had a duty to do so, specifically a duty running to plaintiff.

On that score, plaintiff's proof falls short. Plaintiff relies in part on the deposition testimony of Steven Loucks, who held several positions, including Director of Engineering, at the LLE at the time of the accident. Loucks testified that he wrote the LFORM. Dkt. # 152–4 at 140.

With reference to the statement in the LFORM that "non-qualified diagnostics" are "those that have not completed facility qualification per LLE Instruction 7700 and are not generally selectable on the SRF." Loucks was asked, "What does the word 'generally' in that phrase mean?" He responded, "It means nothing." Plaintiff's counsel asked, "Then why did you put it in the rules?" Loucks answered, "I don't know." Dkt. # 152–4 at 146.

Plaintiff argues that the use of the adverb "generally" means that the fact that a diagnostic is listed on the SRF does not mean that it is qualified. According to plaintiff's reasoning, " 'Generally' means that exceptions to the general rule may exist." Therefore-so the reasoning goes-a diagnostic's "mere presence on the SRF list *cannot* be relied upon regarding the qualification status of a diagnostic." Plaintiff's Mem. (Dkt. # 157) at 22.

The word "generally," as used in the LFORM, will not bear the weight that plaintiff places upon it. Even disregarding Loucks's testimony, and assuming that "generally" implies that a diagnostic could be listed on the SRF and still be non-qualified (because it is not "generally" list-

ed), plaintiff has not identified anything in the LFORM or elsewhere in the record upon which one could reasonably conclude that Dr. Herrmann had a duty to take further steps to verify that the light pipe had been fully and properly qualified, or whether it was "generally" selectable.

■ It bears repeating that plaintiff's claim against LA sounds in negligence. *See* Amended Complaint (Dkt. # 8) ¶ 28 (alleging that defendant's "actions and/or omissions constitute negligence." But "[d]etermining negligence requires first deciding whether the defendant owed a duty to the plaintiff." *Rhinehart v. CSX Transp., Inc.*, 2017 WL 3500018, at *3 (W.D.N.Y. Aug. 16, 2017) (citing *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89, 97, 511 N.Y.S.2d 821, 503 N.E.2d 1358 (1986)). The scope of that duty, if it exists, is circumscribed by what was foreseeable to the defendant. *See S.E.C. v. Obus*, 693 F.3d 276, 288 (2d Cir. 2012) ("negligence requires foreseeability, which concerns what the actor should have known") (quoting Restatement (Third) of Torts § 3, cmt. g (2010)). I see no basis for a finding that Dr. Herrmann should have known that he could not rely on the listing of the light pipe on the SRF, that he should have taken additional steps to determine if it was "generally" selectable (whatever that might mean), or that it was foreseeable to him that failing to take such steps might lead to an accident like the one that injured plaintiff.

For that matter, even if the light pipe had been "generally selectable," then according to plaintiff's logic, Dr. Herrmann should have taken additional steps to make certain that it had been properly qualified per Instruction 7700. Indeed, plaintiff argues as much, going so far as to suggest that Dr. Herrmann should have personally inspected the HYNTD. *See* Plaintiff's Mem. at 15, and personally checked on the bolts anchoring the light pipe.

If plaintiff's position were adopted, then every scientist who submitted an experiment proposal would have to travel to UR, inspect the equipment required for the experiment, and make particularized inquiries about whether each diagnostic listed on the SRF, which would be used in the proposed experiment, had been fully and correctly qualified. There is no evidentiary support for such a conclusion. *See Roberts*, 573 Fed.Appx. at 32 (stating that determining whether a duty exists depends on, *inter alia*, the "reasonable expectation of parties and society generally" and "the likelihood of unlimited or insurer-like liability").

In determining whether a duty exists, the Court has also considered the Cooperative Agreement between UR and DOE, which is in effect an umbrella governing all the approved experiments at the LLE. The Cooperative Agreement incorporates by reference the Federal Demonstration Partnership IV General Terms and Conditions. *See* Dkt. # 154–2 at 74. That document in turn incorporates the requirements of the U.S. Office of Management and Budget circulars as to certain project agreements. *See* https://www.nsf.gov/pubs/fdp/fdp405.pdf. The website referenced in that document, https://www.nsf.gov/awards/managing/fed_dem_part.jsp. states that "[t]he Federal Demonstration Partnership ('FDP') is a cooperative initiative among federal agencies and institutional recipients of federal funds. It was established to increase research productivity by streamlining the administrative process and minimizing the administrative burden on principal investigators while maintaining effective stewardship of federal funds."

It would hardly serve the purposes of "streamlining the administrative process and minimizing the administrative burden on principal investigators" to impose on them the duties suggested by plaintiff The

whole point of the administrative system seems to be to allow PIs whose experiments have been approved to have those experiments conducted at a remote facility, using that facility's equipment, under the control of that facility's employees. If each person submitting a proposal were required to make a personal inspection and determination of whether the relevant diagnostics-even those listed on the SRF-had been properly qualified, one can easily imagine how cumbersome, unwieldy and self-defeating the system would become.

I reiterate that I am not discounting or ignoring the Court of Appeals' statements that there were genuine disputes "as to whether Dr. Herrmann was required to list the light pipe on his experiment proposal as a non-qualified diagnostic," and as to his "obligations regarding the qualification of the light pipe." But as noted, that statement was made in the context of a case that was still in its early stages, with respect to discovery, and the Court of Appeals in no way indicated that those issues had to go to trial.

The evidence gathered and adduced since that decision was issued indicates one thing upon which the parties seem generally to agree: that the qualification process for the HYNTD, which was conducted by UR employees, was flawed or incomplete. Plaintiff's claim is premised on his assertion that the light pipe was not properly qualified, and defendants have freely admitted that, with respect to the HYNTD, the qualification process could have been better. UR's own incident report stated that the "incident was caused by the failure to rigorously follow the procedures" of Instruction 7700, in a number of respects, and identified several other contributing factors. Dkt. # 152–7 at 10. The report goes on to list those shortcomings in some detail (including flaws in the mechanical design of the equipment, inadequacies in the support structure, failure to follow correct procedures when conducting the experiment, and so on), none of which would have been apparent or foreseeable to an outside user like Dr. Herrmann, who could only see what was listed on the SRF. Loucks also testified that the light pipe "was not properly qualified in accordance with 7700 instruction [sic]. We did not comply with the procedure." Dkt. # 152–4 at 158.

What is equally clear, however, is that the light pipe *was* listed on the SRF. And what is lacking is (1) any reason to think that Dr. Herrmann should have known of the deficiencies in the qualification process, and therefore (2) any reason to conclude that Herrmann was required to list the light pipe as non-qualified. Loucks testified that "[t]he only way that a principal investigator, such as Herrmann, can determine whether or not a diagnostic is qualified or not is from a list of available diagnostics that he sees and selects, period." Dkt. # 152–4 at 156. Plaintiff has presented no evidence to the contrary. He has not shown that there was any way that Dr. Herrmann could reasonably have been expected to know, or even suspect, that he should confirm that the light pipe had been properly qualified prior to its being listed on the SRF.

Furthermore, even had Dr. Herrmann made a specific inquiry about the light pipe, there is no reason to think that anyone at UR would have told him that it had not been properly qualified, or that they would have looked into the matter further, much less that they would have allowed Herrmann to make an independent determination of whether the light pipe was qualified, or that the anchoring bolts were sufficient.

All of the evidence indicates that at the time of Dr. Herrmann's proposal, as far as UR was concerned, the light pipe *had* been

qualified. In hindsight, it may now be apparent that the light pipe's listing on the SRF was ill-advised, in the sense that the testing process was not as thorough as it should have been, but its listing on the SRF was not the result of a clerical error or similar mistake that could have been caught and corrected through a simple double-check of the SRF. Thus, even if Dr. Herrmann had asked about the light pipe, that would not have prevented this accident from occurring.

It also seems self-evident that UR must have known-or at least was in a far better position than an outside user like Dr. Herrmann to know-whether any given diagnostic listed on the SRF was "qualified" or not. In requesting the use of the HYNTD, Dr. Herrmann was not proposing to introduce into the experiment some *new* equipment with which UR was unfamiliar. Had that been the case, it would have made perfect sense to put the burden on him to identify it as non-qualified.

But that is not what happened. Dr. Herrmann selected a device that UR had made available to him. If anyone was in a position to know whether that device was "qualified," it was UR. The fact that no one at UR questioned Herrmann's failure to identify the light pipe as non-qualified reinforces the conclusion that Herrmann had no duty to do so.

It also bears emphasis that plaintiff's injuries were not directly caused by the malfunction or failure of the light pipe itself. That is not to say that the problem with the light pipe was not a contributing factor. The point is, this was not a situation in which the light pipe exploded in plaintiff's face. Rather, whatever went wrong caused the light pipe to fall from its moorings, and it, or other debris, landed on plaintiff.

In that regard, the complaint alleges that the mounting plate for the light pipe was inadequate, because it was mounted with quarter-inch bolts, rather than half-inch bolts, as called for by the design. (Dkt. # 8 ¶ 20.) That is consistent with UR's post-incident report, which stated that "the Light–Pipe structure fell from its support" due to the use of "three ¼ inch bolts rather than the apparent design intent of five ¼ inch bolts." Dkt. # 152–7 at 10. How was Herrmann to uncover that before the experiment?

While there were several contributing causes of the accident, a significant cause was the simple failure to use enough bolts, of sufficient size. Dr. Herrmann could not reasonably have been expected to confirm that the light pipe's support structure had been adequately installed.

At oral argument, plaintiff's attorney asserted that "[t]here absolutely was an obligation for [Herrmann] to check every piece of equipment he was intending to use, ... including these bolts, correct." (Dkt. # 176 at 7.) But as stated above, the whole point of the administrative system is to streamline the process of approving and performing experiments. Given that goal, it seems far-fetched to think that anyone whose experiment had been approved would have to go to the LLE and physically inspect each piece of equipment that was going to be used in the experiment.

That is particularly so, given the limited access that outside users had to the LLE. Plaintiff has not rebutted UR's assertion that a principal investigator-*i.e.*, the person who proposes the experiment, such as Dr. Herrmann-is never a part of the "Watch Organization," a group of operators and technicians who are "responsible for safety, shot execution and data collection," and the members of whom actually control the equipment during an experiment. (Dkt. # 57 ¶¶ 23–25.) Thus, it is not only unreasonable to think that Dr. Herrmann should

have personally gone to the LLE to inspect the equipment or exercise some control over the experiment, it is unlikely in the extreme that he would have been allowed to do so.

**Plaintiff's "Expert" Testimony**

In opposition to defendants' motions, and in support of his own motion for summary judgment, plaintiff has submitted an affidavit of his expert, Carl Abraham, who opines that LA "had various duties it owed to plaintiff...." (Dkt. # 157–14 at 1, ¶ 3.)

■ LA has moved to disqualify Abraham from testifying. (Dkt. # 165.) LA contends that Abraham's testimony is not reliable under the standards established by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

As will be made clear, I conclude that Abraham's opinions are properly excludable, both because Abraham is unqualified to offer expert opinions in these matters, and because his testimony does not "rest[ ] on a reliable foundation." *Id.* at 597, 113 S.Ct. 2786. But I also conclude that even if the Court were to take Abraham's opinions into account, LA would be entitled to summary judgment. Abraham's testimony and report are insufficient to give rise to a genuine issue of material fact with respect to the ultimate issue in this case, and the central issue upon which Abraham opines: whether Herrmann owed a duty to plaintiff, as to the light pipe.

■ Expert testimony should not be admitted if it will not "assist the trier of fact." Fed. R. Evid. 702. District courts therefore have the duty to ensure that an expert witness's testimony "rests on a reliable foundation." *Id.* District courts have "broad discretion" in deciding whether to

admit expert testimony. *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993).

The Second Circuit has also cautioned that "[t]he liberal rules governing expert testimony ... were not designed to open the door for the admission of all sorts of expert opinions thereby trespassing on the province of the jury and the trial court." *Id.* Although Rule 704 of the Federal Rules of Evidence states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the Court of Appeals has stated that "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988). Simply put, testimony that is designed to instruct the jury on the applicable law is not admissible because, by purporting to do what lies with the exclusive province of the court, it cannot be helpful to the jury. *Id.* at 140. And as noted above, the existence of a duty is ultimately a question of law for the Court.

I begin by examining Abraham's educational and employment background, which immediately undercuts the reliability of his opinions relative to this case. While Abraham states that he has had a lengthy career involving many aspects of laboratory research, it is curious that his curriculum vitae ("CV") states that he holds MS, PhD, DSc, and JD degrees, but does not state which educational institutions awarded those degrees. Dkt. # 157–15 at 16.[2]

At his deposition in this case, Abraham stated that his PhD was from "Clayton University." When asked whether Clayton

---

**2.** Similarly, Abraham states that he has "[l]ectured and taught at various universities in the United States and Europe," though he does not identify those institutions. Dkt. # 157–15 at 17.

was an accredited institution, Abraham responded that it had been "approved by the Department of Education" and that it was "started by the Department of Education in conjunction with Harvard University...." Dkt. #174-2, Ex. F at 112. LA has submitted evidence, however, in the form of a newspaper story-which plaintiff has not challenged or rebutted-that Clayton University was an unaccredited school that was closed by the State of California "after several former students complained about paying as much as $4,000 and receiving no education." *Id.* Ex. E.

Abraham's CV claims expertise in a wide array of subject areas, which generally relate to safety, with respect to products or premises. Much of his experience relates to sports equipment (*e.g.*, football face masks) and recreational facilities, such as playgrounds and roller coasters. When asked if he was "familiar with the specific equipment involved in the accident," Abraham stated that he had "read about it," but was "not an expert in it." As Abraham himself stated, "[t]here's a difference." *Id.* Ex. F at 71. By his own admission, then, Abraham is *not* an expert regarding the equipment that was at the center of the accident that caused plaintiff's injury.

While not dispositive, there are also a number of reported cases in which courts have either excluded, or found not credible, expert testimony or opinions by Abraham. *See Denero v. Palm Horizons Mgmt., Inc.*, 2016 WL 1589843 (D.V.I. Apr. 19, 2016); *Landis v. Hearthmark, LLC*, 2014 WL 218625 (N.D.W.Va. Jan. 15, 2014); *Kilcrease v. T.W.E., L.T.D.*, 2004 WL 5509089 (D.Kan. May 18, 2004); *Melendez v. First Presbyterian Church*, 56 Misc.3d 1203(A), 2017 WL 2784953 (Sup. Ct. Dutchess Co. June 27, 2017); *Luftman v. Fashion 21, Inc.*, 31 Misc. 3d 274, 916 N.Y.S.2d 895 (Sup. Ct. N.Y. Co. 2010); *Rabon–Willimack v. Robert Mondavi*

*Corp.*, 73 A.D.3d 1007, 905 N.Y.S.2d 190 (2d Dep't 2010). Certainly each case must be decided on its own facts, but the point is that this does not appear to be the first case in which a party has introduced opinions by Abraham that are of dubious reliability.

Based on the facts recited above, the Court could quite easily grant LA's motion, and simply disregard Abraham's opinions, based on his lack of qualifications. But as stated, even taking his opinions into account, the result here would be the same.

In support of his opinion that LA owed plaintiff certain duties, and that it breached those duties, Abraham cites DOE regulations setting forth "worker safety and health requirements" with respect to "the conduct of contractor activities at DOE sites." 10 C.F.R. § 851.1(a). "Contractor" is defined in those regulations as "any entity ... under contract with DOE, or a subcontractor at any tier, that has responsibilities for performing work at a DOE site in furtherance of a DOE mission." 10 C.F.R. § 851.3. "DOE site" is defined as "a DOE-owned or -leased area or location or other area or location controlled by DOE where activities and operations are performed at one or more facilities or places by a contractor in furtherance of a DOE mission." *Id.*

Plaintiff has not submitted evidence that the LLE was a "DOE site," as defined in those regulations. The site where the accident occurred was owned and controlled by UR, not DOE, and nothing in the record suggests otherwise. UR apparently received some funding from DOE, but there is no evidence that the LLE was owned, leased, or controlled by DOE.

In addition, by its terms this part of the regulations "does not apply to work at a DOE site ... [r]egulated by the Occupational Safety and Health Administration."

10 C.F.R. § 851.2(a). Abraham himself (self-contradictorily, given that exclusion) cites regulations of the Occupational Safety and Health Administration ("OSHA"), based upon which he contends that LA breached its duty to plaintiff under those OSHA regulations.

To the extent that OSHA regulations applied to this work site, that would thus remove the site from the scope of the DOE regulations. But the OSHA regulations, on their face, would apply to the LLE only as between UR and plaintiff. By their terms, those regulations "apply with respect to employments performed in a workplace ...." 29 C.F.R. § 1910.5(a). The regulations set forth standards that must be adhered to by "employers," with respect to work performed by "employees." See 29 C.F.R. § 1910.2(c) and (d). It is undisputed that plaintiff was not an employee of LA. He was an employee of UR.

Abraham's citation to another section of the OSHA regulations, Part 1926, see Dkt. # 157–15 at 6–7, is likewise inapposite. On its face, Part 1926 applies to "construction, alteration and/or repair" of facilities subject to the Contract Work Hours and Safety Standards Act, which applies to certain federal service contracts and federal and federally-assisted construction contracts. See Cole v. Noble Drilling Corp., No. 1:05CV479, 2007 WL 2475944, at *4 (S.D.Miss. Aug. 28, 2007) (citing 40 U.S.C. § 3701(b)). Those regulations plainly have no application here. This case has nothing to do with construction contracts or repairs.

Abraham goes on to reference a number of industry codes and practices, such as a safety code published by the American Society of Mechanical Engineers, and codes set forth by the National Fire Protection Association. Those codes generally address safety procedures to be followed in conducting experiments and using certain types of equipment.

But as with the federal regulations, plaintiff's reliance on those codes and provisions misses the mark. Plaintiff begs the question by assuming that it was LA that used the equipment in question and conducted the experiment in which plaintiff was injured. As stated, the undisputed facts conclusively show otherwise. The central issue here is not whether there was some failure to follow proper procedures-by all accounts, there was-but where the fault lies. The regulations and codes relied upon by Abraham only serve to reinforce the conclusion that it was UR, not LA, that actually conducted the experiment, and that if any entity was in a position to have prevented this accident, it was UR.

In that regard, I again note the Second Circuit's statement that "[i]f a new duty of care were to be imposed, '[a]n important criterion is whether the realities of every day experience demonstrate that the party to be made responsible could have prevented the negligent conduct." While the court found, at that stage of the case, that there were "genuinely disputed facts with respect to Dr. Herrmann's obligations under the LFORM [that were] material to [a] determination of whether he could have prevented the accident," the evidence presented since that decision was handed down has only demonstrated the paucity of proof that as a practical matter, Dr. Herrmann could have done so.

Despite the Second Circuit's reference to whether Dr. Herrmann "could have prevented the accident," I do not read the court's decision (or the Vogel decision, which the Court of Appeals cited) as suggesting that the existence of a legally enforceable duty depends on whether, in hindsight, there is any conceivable way in which a party could have done something that might, perhaps, have prevented an

accident. To adopt plaintiff's position would stretch the concept of duty beyond the breaking point, and would render virtually anyone with any connection to an event, no matter how attenuated, potentially liable. In effect, this would transform plaintiff's negligence claim to one sounding in strict liability. Plaintiff has presented no authority that would support such a result.

Given the manner in which experiments were proposed, approved, and conducted at the LLE, Dr. Herrmann was in no position to anticipate or guard against an accident such as this one. To hold otherwise would require a degree of prescience on his part that would be inconsistent with "the realities of every day experience," particularly in the context of the procedures that were in place, which put the ultimate responsibility for ensuring the reliability of the LLE's equipment on UR.

■ Analogizing the LFORM to a contract, the Second Circuit also stated that there are circumstances under which a contract "can establish a duty of care owed by a contracting party to a third party," such as "where the contracting party has entirely displaced the other party's duty to maintain [a] premises safely." 573 Fed. Appx. at 33 (quoting *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 140, 746 N.Y.S.2d 120, 773 N.E.2d 485 (2002)). The factual record here lends no support to a finding that Dr. Herrmann or LA "entirely displaced" UR's responsibility to ensure the safety of the equipment used at the LLE. As explained above, the lab was under UR's sole control throughout the course of the events in question. Cf. *Palka v. Servicemaster Mgmt. Services Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 192 (1994) ("extensive privatization arrangement" by which hospital and property management company "displaced entirely the hospital's prior in-house maintenance program and substitut-

ed an exclusive responsibility in Servicemaster to perform all of Ellis Hospital's pertinent nonmedical, preventative, safety inspection and repair service functions" supported imposition of liability against property management company in favor of nurse who was injured when a wall-mounted fan at the hospital fell on her).

In reaching these conclusions, the Court reemphasizes that it is not disregarding the Court of Appeals' statements in its 2014 decision concerning the possibility that LA may have owed plaintiff a duty to ensure that the light pipe was safe. The case law makes clear that where the facts are undisputed, the question of duty is properly decided by the district court as a matter of law. In the wake of all the discovery that has taken place, and having considered the reams of affidavits, deposition transcripts, and exhibits that have been produced, I find no basis upon which to impose such a duty on LA.

Were this case to go to trial, it is difficult to imagine what questions of fact the Court could submit to the jury, relative to whether Dr. Herrmann owed plaintiff a duty. There is no dispute about what happened. The only disagreements, at this point, concern the purely legal questions concerning who, if anyone, owed plaintiff a duty. Based on the facts before me, I find as a matter of law that LA did not owe a duty to plaintiff, relative to the accident that caused plaintiff's injuries.

## II. Other Motions

In addition to the summary judgment motions, the parties have filed five other motions. LA has moved to strike plaintiff's motion for summary judgment, on the ground that plaintiff's motion is time-barred. (Dkt. # 158.) LA has also moved to disqualify plaintiff's expert, Carl Abraham, from testifying. (Dkt. # 165.)

UR has moved for an order striking Abraham's affidavit and report in connection with plaintiff's opposition to UR's summary judgment motion, on several grounds, generally procedural in nature. (Dkt. # 167.)

Plaintiff has moved for an order granting him leave to call Abraham (who was identified as plaintiff's rebuttal expert) in his case in chief, and striking the affidavit of LA's expert, Roger Shrouf, which LA submitted in opposition to plaintiff's summary judgment motion and in further support of LA's summary judgment motion. (Dkt. # 174.) Plaintiff has also moved for an order striking the affidavit of David Meyerhofer, which LA submitted in support of its motion to disqualify Abraham. (Dkt. # 178.) Plaintiff's motions to strike are based on his assertion that LA's witnesses' affidavits are untimely.

To a great extent, all these motions can be, and are, denied on the ground that they are moot. The Court will therefore address them only briefly.

With respect to LA's motion to strike plaintiff's summary judgment motion as untimely, LA is correct that plaintiff's motion was filed a month and a half past the November 15, 2016 deadline in this case for filing dispositive motions. See Dkt. # 139. But since the Court has denied plaintiff's motion, and granted summary judgment in LA's favor, obviously LA has not been unfairly prejudiced by plaintiff's arguably late filing. In any event, since all the parties have moved for summary judgment, the Court in its discretion would deny LA's motion to strike plaintiff's summary judgment motion.

With respect to LA's motion to disqualify Abraham from testifying, the Court grants that motion, for the reasons stated above in connection with the summary judgment motions. I again note, though, that even if the Court were to consider Abraham's opinions, I would conclude that LA is entitled to summary judgment.

As to the other three motions—UR's motion to strike Abraham's affidavit and report, and plaintiff's motions for leave to call Abraham in plaintiff's case in chief, and to strike the affidavits of LA's witnesses Roger Shrouf and David Meyerhofer, those motions are denied as moot. Defendants' arguments, though, appear to have merit. Much of this dispute seems to have its genesis in plaintiff's belated realization that he might be well advised to retain an expert witness. It does seem that Abraham's report is excludable, at least in part, on procedural grounds alone, inasmuch as it exceeds the scope permitted by the August 19, 2016 Order issued by Magistrate Judge Jonathan W. Feldman, who supervised discovery in this case. See Dkt. # 145.

But as indicated, even considering Abraham's opinions, and disregarding those of Shrouf and Meyerhofer, I find that LA is entitled to summary judgment, dismissing the complaint.[3] UR is therefore entitled to summary judgment dismissing LA's third-party complaint against it.[4]

---

**3.** Notably, neither LA nor UR relied on expert opinions in support of their summary judgment motions. The affidavits of Meyerhofer (who LA contends is a fact witness, not an expert witness) and Shrouf that are the subject of plaintiff's motions to strike were submitted by LA in rebuttal to Abraham's opinions.

**4.** Though this plays no part in the Court's decision, it is worth pointing out that plaintiff is not left without a remedy. Plaintiff has already been awarded very substantial worker's compensation benefits.

## CONCLUSION

Plaintiff's motion for summary judgment against defendant Los Alamos (Dkt. # 157) is denied. Los Alamos's motion for summary judgment dismissing plaintiff's complaint (Dkt. # 154) is granted. Defendant University of Rochester's motion for summary judgment dismissing Los Alamos's third-party complaint (Dkt. # 152) is granted. The complaint is dismissed.

Los Alamos's motion to disqualify plaintiff's expert witness, Carl Abraham (Dkt. # 174), is granted.

The following motions-Los Alamos's motion to strike plaintiff's summary judgment motion (Dkt. # 158); University of Rochester's motion to strike Abraham's report and affidavit (Dkt. # 165); and plaintiff's motions for leave to call Abraham as an expert witness in his case in chief, and to strike the affidavit of LA's expert Roger Shrouf (Dkt. # 167.), and plaintiff's motion to strike the affidavit of LA's witness David Meyerhofer (Dkt. # 178)-are all denied as moot.

IT IS SO ORDERED.